SPARKS *v.* BELL, administrator, *et al.*

No. 14889. July 6, 1944. Rehearing denied July 18, 1944.

*J. C. Newsom* and *J. D. Godfrey,* for plaintiff.
*J. J. Harris* and *E. T. Averett,* for defendants.

Grice, Justice. ■ The first assignment of error relates to the refusal to grant a continuance on account of the absence of two witnesses. The showing was made by the husband of the plaintiff. His testimony was as follows: "I am the husband of Mrs. Venice Sparks. As her husband I have been assisting her in

preparing this case. There are some witnesses, who have been summonsed, who have not answered—W. F. Garner and Newman Lewis. I expect to prove the contract that we are putting out in case we are contending for by Newman Lewis. He has been summonsed. I summonsed him. I think the sheriff delivered it. I got a summons from the clerk, and gave it to the sheriff. I presume the sheriff delivered it. I gave him the summons before the last term of court. I don't know that I have talked with him about it—well, yes, I think one time since then. Q. Tell us what he said he would swear about it? A. He talked to papa about it, and papa told him about the contract—that he told my wife that he would give her the place if she would stay there and take care of him and wait on him. The witness lives in this county. Q. Are you making this motion for the purpose of delay, or for the purpose of getting the witness here? A. For the purpose of getting the witness here. Q. Any other witness that you can prove this particular fact by? Is that all the witness you can prove it by? Is that all you can prove by the witness? A. Well, similar. Q. Is there any other witness that you can prove all of it by, all the facts that you can prove by this witness? A. No, sir, I don't think so. I expect to prove by Mr. W. F. Garner possession and residence, that we took over with the place and the responsibility, the protection and responsibility. He had a conversation with my father about it. He lives about two and a half miles from where my father lived. Papa was ten or twelve years older than he was. Mr. Garner has been summonsed, summonsed before the other court. I have talked with him about it. It has been a good bit since I talked with him about it. I saw him last night but did not mention coming to court. I imagine he knows this subpœna requires him to come to court. I am making this motion for the purpose of getting the witness here. I do not know why Newman Lewis is absent. I do not know where he works. I do not know why Mr. Garner is absent. Both of the gentlemen live in this county. I was talking to one of them last night, but did not mention his coming." Counsel for the plaintiff: "That is our showing, Your Honor." The court: "Well then, with that showing, gentlemen, I overrule the motion for a continuance. If you want attachments for them, the court will give you attachments." Counsel for the plaintiff: "No, sir, we do not want to attach them and put them

to that cost." The plaintiff herself, although present in court, did not testify on this motion.

We are of the opinion that the trial judge on this showing did not abuse his discretion in refusing to continue the case.

■ The remaining exception is to the grant of a nonsuit. The only ruling which a motion to nonsuit invokes is, whether the plaintiff proved her case as laid, without establishing such additional facts as disproved her right to recover. *Clark* v. *Bandy,* 196 *Ga.* 546 (27 S. E. 2d, 17). The determination of such an issue requires a consideration of the petition and of the evidence, and a comparison of the two.

The petition sought specific performance of an alleged contract between the plaintiff and J. E. Sparks, deceased; that title to certain land, the subject-matter of the suit, be decreed in her; that a sale of the property under certain judgments against J. E. Sparks be enjoined; and that the judgments be decreed null and void. As the basis of these prayers, she alleged a contract between herself and J. E. Sparks, her late father-in-law, by the terms of which, if she would remain with him in his home so long as he lived, and would continue to render the same services she had been rendering, he would give her all he had, and would make her a deed to the home where they lived, but that he died before making said deed. She alleged that on June 5, 1924, J. E. Sparks executed a deed to the same property, purporting to secure an indebtedness in stated amounts, to H. B. Sparks, T. R. Sparks, and J. C. Sparks; that said deed was without consideration and totally void, and was not and is not a valid encumbrance on the lands he promised to convey to her; the deed having been made to save said land after the failure of a certain bank in which he had been a director or officer of some kind. Her original petition contained an allegation that J. E. Sparks made her the offer in June, 1925, when she had the opportunity of taking a position with South Western College at Americus, Georgia, for a good salary; that she was considering the matter and intended to accept the position; but that, "when the said J. E. Sparks made petitioner the promise to give her all he had and make her a deed to all the land he had, she considered it, and a little later told him she would continue to stay with them and do for them as she had been doing. Petitioner then gave up the idea of going to Americus, Georgia,

and accepting college work there." By an amendment she fixed the time when he made her the offer to give her his property as "during the summer of the year 1918, during the month of July." By this same amendment paragraph 4 of the petition, which has been first quoted above, was amended so as to make it read as follows: "When the said J. E. Sparks repeated his promise to give her all he had and make her a deed to the land he had, she considered it, and a little later told him she would continue to stay with them and do for them as she had been doing. Petitioner then gave up the idea of going to Americus, Georgia, and accepting college work there." Fairly construed, her allegations with respect to her acceptance of his offer, so as to make the alleged contract binding, was after she had received the offer to go to Americus, which as heretofore seen was in June, 1925.

The evidence of her husband fixed the date of her acceptance as "about July, 1918." The plaintiff herself gave testimony as to other matters, but fixed no date. No other witness testified as to the date that she accepted the offer of J. E. Sparks. It takes offer and acceptance to make a contract. Therefore the proof failed to support the allegations of her petition as to the date of the contract which she relied upon. While ordinarily a difference between the allegata and probata as to the date of the contract might not be fatal, it is fatal in this case, because the record shows that Sparks executed the deed, which is here under attack, on June 5, 1924, whereas the contract which it is alleged he made with the plaintiff, and which she seeks here to enforce, was made subsequently to June, 1925. Under these circumstances, the date of her alleged contract was most material. When the proof came in, it showed that she was not in position to attack the deed which had been theretofore made. She failed to prove her case in another respect. She attacked for fraud the deed given to secure the alleged indebtedness, and the judgment founded on the evidence thereof, on the ground that they were without consideration, and that the deed was made to save his land after the failure of a bank in which he was a director or officer. The proofs do not support these allegations, the only evidence on that subject coming from her husband, who testified as follows: "I know about the time he made a deed to secure a debt to H. B. Sparks and myself. Because of the conversation that he had with Mr. Garner, we tried to save

the place from the bank failure, me and my father came to Sanders-ville just before he made the deed, and he consulted with a law-yer, Colonel Jordan, and he later made a deed. As to whether he owed the two brothers, T. R. and H. B. Sparks, anything at that time, he just lost some money in the bank that was in there to their credit; that was all the indebtedness that he owed them, if any; their money was in the bank at the time it closed. I know about what date that deed was made, it was the 5th day of June, 1924. . . He [J. E. Sparks] was guardian of his two brothers; that is not the way this indebtedness arose; this indebtedness was owed by the bank breaking; there wasn't any indebtedness to them, but he lost it; he had their money, and he—and in his representative. capacity lost the money. I don't say that he attempted to make it good to his brothers. As to whether he did give them evidence of indebtedness in the form of a security deed, there was a security deed drawn up."

There is a third reason: The plaintiff asserts that she has been in peaceable and uninterrupted possession for more than 20 years; that "petitioner's possession of said land and premises, as above alleged, was open, visible, exclusive and unambiguous, not liable to be misconstrued or misunderstood." The proof was lacking to support such an allegation. On this subject the plaintiff testi-fied: "I claim that place as mine. I have been living there since the summer of July, 1918. As to whom I lived with there during the time we lived there, from 1918 until 1938, there was Mr. Sparks and Mrs. Sparks, and he had a crippled brother, and from time to time families of them would just move in and just move out—sometimes there were four or five families there at one time, and they would come and stay until they made other arrangements; they lived in there with us; I considered it my home." The only other evidence was that of her husband, as follows: "When I first married, we lived in the house with my father and mother about six months; we then moved out in a house on the place and stayed out about five or six months, lived out there about five or six months, then we moved back in the house with J. E. Sparks and his family, and we remained there until now. . . He [J. E. Sparks] went to her [plaintiff] and told her if she could come on and live in the house with them and do the work there, that he would give her what he had, and she accepted it and she then

moved back in the house; that was about July, 1918. As to who else lived in the house, J. W. Sparks and his wife and daughter also lived there until 1925. . . She stayed there six or seven years, and me and my wife lived in the house with him and nobody else in the house but us. . . My wife took possession of this place under their contract in 1918, and she has been in possession of it since that time—in open, notorious, exclusive, and uninterrupted possession. . . My uncle, H. B. Sparks, also lived in the house besides my wife, myself, and my mother. . . He [J. E. Sparks] lived in the house with the balance of the family all around the same fireplace. . . During the twenty years that she stayed there with him, she done all that was necessary in taking care of the housekeeping and taking care of him and my mother and the uncle. . . When we first went there and before we moved away from there the first time, J. W. Sparks and his wife lived in the house, and I don't know, there was always from two to three families in the house, but I know he was in there and his wife was in there and there might have been one or two more families in there. Mr. T. R. Sparks was not there at that time, but Mr. H. B. was there at that time. When I went there in 1918, the summer of 1918, the same people were living there, and Mr. John Willie Sparks and his wife continued to live there after we returned to the home place in the summer of 1918 until the spring of 1925; in other words, they stayed there about a year after the security deed was made, that my father made to his two brothers. . . On the day that the security deed was made in 1924, my father, John E. Sparks, the person who signed the security deed, was living on this property and in that house where we now live, and I am his son. I am the son of Mr. John Ed Sparks. H. B. Sparks was a brother to my father, and T. R. Sparks was a brother to my father. There was only one of those persons living at the home place at the time this security deed was signed, and that was H. B. Sparks that was living there."

The plaintiff pitched her case in her pleadings on the foundations above indicated. She proceeded on the theory that it was necessary to show that the judgment based on the alleged indebtedness and the security deed were without consideration and fraudulent, and further that she was in the exclusive possession of the premises, and that, if she showed these facts, she would be entitled

162

to the relief sought, which would make the alleged contract enforceable against the defendants. So far as appears from this record, there was no demurrer to her petition or to her amended petition. It was incumbent on her, in order to prevent the judgment of nonsuit sought by the defendants, to prove her case as laid. This she did not do.

*Judgment affirmed. All the Justices concur.*